1
2
3
4

Mark D. Samson
KELLER ROHRBACK L.L.P.
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
msamson@kellerrohrback.com

5
6
7
8
9

Michael W. Sobol (*pro hac vice* application forthcoming)
Roger N. Heller (*pro hac vice* application forthcoming)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008
msobol@lchb.com
rheller@lchb.com

10

*Attorneys for Plaintiffs and Putative Class*

11

[Additional counsel listed on signature page]

12

13

14

15

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| B.P. and D.L., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Theranos, Inc.; Walgreens Boots Alliance, Inc.; and Does 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   **INTRODUCTION**

1.     This consumer fraud class action is based on Defendants' false and misleading marketing of Theranos as a disruptive technology in the laboratory services business.  What allegedly made Theranos a breakthrough was its proprietary Edison blood testing devices.  In contrast to the large needle and numerous tubes required in a typical venipuncture blood draw, Theranos's Edison devices were handheld machines, supposedly able to take a few drops of blood from a patient's finger placed into a nanotainer capsule, and conduct hundreds of blood tests, all outside a lab.

2.     Theranos sold its new "tiny blood test" at Wellness Centers at Defendant Walgreens Boots Alliance, Inc.-owned Walgreens pharmacies in Arizona and California, at a Capital BlueCross Capital Blue retail store in Pennsylvania, and at Theranos-owned Wellness Centers in Arizona and California.  Theranos and Walgreens assured customers that these tests were highly accurate, industry leading in quality, and developed and validated under, and compliant with, federal guidelines.  Thousands of people, including Plaintiffs, believed Defendants' representations, and paid for Theranos's tests.

3.     However, the Edison machines did not work, and Theranos's tests were not accurate.  This became evident on May 19, 2016, when Theranos conceded that it had informed regulators that it had voided "all" blood-testing results from its proprietary Edison machines, as well as many tests run on traditional machines from 2014 and 2015.[1]  As a result, tens of thousands of patients, if not more, may have been given incorrect blood-test results, been subject to unnecessary or potentially harmful treatments, and/or been denied the opportunity to seek treatment for a treatable condition.

4.     Plaintiffs, for themselves and all others similarly situated, (*i.e.*, the members of the Classes described and defined within this Complaint), bring this action for damages, including reimbursement of the purchase price of the tests as well as an order enjoining Theranos from engaging in further deceptive advertisements, pursuant to the Arizona Consumer Fraud

---

[1] In the Scottsdale Facility, regulators found that Theranos used mis-programmed machines to evaluate blood coagulation tests, failed to properly gauge water purity in machines it used, and failed to meet laboratory quality standards.

CLASS ACTION COMPLAINT

Statute, A.R.S. §§ 44-1521 *et seq.*, California Business and Professional Code §§17200, *et seq.*; California Business & Professional Code §§ 17500, *et seq.*; California Civil Code §§1750, *et seq.*; California Civil Code §§1710; and common law causes of action for fraud, negligent misrepresentation, unjust enrichment, and aiding and abetting by Defendant Walgreens, and allege as follows:

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiffs and Defendant are citizens of different states and because, upon information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest, there are more than 100 members in the proposed Class, and at least one member of the Class of Plaintiffs is a citizen of a state different from a Defendant.

6.    This Court has personal jurisdiction over the Defendants because Defendants have conducted and continue to conduct business in the State of Arizona, and because Defendants have committed acts and omissions complained of herein in the State of Arizona.

7.    Venue as to Defendants is proper in this judicial district because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District. Venue is also proper because Defendants have conducted, and continue to conduct, business within this District.

## III.    PARTIES

8.    Plaintiff B.P. is a resident and citizen of Phoenix, Arizona and is using his initials to protect his privacy in this litigation.

9.    Plaintiff D.L. is a resident and citizen of Maricopa, Arizona and is using her initials to protect her privacy in this litigation.

10.    Defendant Theranos, Inc. ("Theranos" or the "Company") is a blood testing company based in Palo Alto, California.  The Company operates two laboratories, one in Newark, California, and another in Scottsdale, Arizona.  Through Wellness Centers located predominantly in Walgreens pharmacies in Arizona and California, Theranos sells blood tests to

CLASS ACTION COMPLAINT

individuals.  Since it began offering testing services in 2013, the company has conducted 6.1 million diagnostic tests.

11.     Defendant Walgreens Boots Alliance, Inc. ("Walgreens"), of Deerfield, Illinois, is a global pharmacy-led health and well-being enterprise, which, among other segments operates the Walgreens retail pharmacy chain in the United States.

12.     The true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiffs may seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become known.

13.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## IV.     FACTUAL BACKGROUND

### A.     Theranos Background and Theranos Technology

14.     Theranos was founded in 2003 by Elizabeth Holmes who has maintained that she developed the idea for the company as a result of her self-professed phobia of needles. According to published reports, the Company initially focused on development of a hand held device that would use a tiny needle to obtain a small drop of blood for analysis.  By 2008, the project had grown into what is now known as the Edison device.

15.     In contrast to the large needle and numerous tubes required in a typical venipuncture blood draw, Theranos's Edison device was designed to eliminate the need for laboratories altogether.  The concept was that a nanotainer containing a few drops of blood from a finger stick would be placed into a cartridge which would, in turn, be placed into a proprietary

Edison device (which Theranos executives have never allowed to be photographed) where a button pushed by a staff person generates results that are automatically transmitted to Theranos's databases.  This concept would have enabled Theranos to conduct all testing outside of the laboratory in the Wellness Centers and thus – according to Theranos – revolutionize testing by significantly reducing the time and costs involved.

16.     People believed that Theranos's Edison Technology was a true disruptive technology breakthrough.  The Company's founding CEO, Elizabeth Holmes, was hailed as the next Steve Jobs and by 2014, Theranos was valued at $9 billion – approximately the same as each of its two largest and long established competitors in the blood testing industry.

17.     By 2011, Theranos was in talks with both Safeway and Walgreens to offer Theranos Edison technology testing in their stores.  In 2013, Theranos entered into a partnership agreement with Walgreens, under which Walgreens invested $50 million in Theranos, and Theranos agreed to operate blood drawing centers, which it called "Wellness Centers" at Walgreens Pharmacies in Arizona and California.  Following launch of the partnership in 2013, Theranos and Walgreens planned to build Theranos Wellness Centers in more than 8,200 Walgreens stores nationwide.

**B.     Walgreens Failed to Verify the Accuracy or Reliability of Theranos Technology**

18.     Before entering the partnership with Theranos, Walgreens Chief Medical Officer neither reviewed Theranos's technology nor independently validated or verified the results of the tests.[2]  Nevertheless, Walgreens said it was confident in the data before introducing the services.[3]

19.     In fact, although a Johns Hopkins University scientist had requested that Ms. Holmes provide his researchers with an Edison device so that he could verify the technology for Walgreens, and Ms. Holmes initially agreed to provide one, the device was never provided. Instead, Walgreens got a prototype which the Hopkins team tried to evaluate, but the prototype came equipped to perform tests that produced results which did not compare to other labs' tests.

---

[2] http://www.economist.com/news/business/21697273-pressure-mounting-startup-has-tried-shake-up-lab-test-market-blood-sports (last visited August 15, 2016).
[3] *Id.*

CLASS ACTION COMPLAINT

As a result there was no way to compare results from the prototype Edison device to the results of other commercially available tests.

20.     In the summer of 2011, just after Theranos and Walgreens signed their initial letter of agreement, Walgreens sent a delegation, including its finance chief, internal auditor, and lab experts from a consulting firm called Collaborate, LLC to a meeting at Theranos headquarters in Palo Alto, the purpose of which was to gain a firsthand view of the Theranos business and capabilities.

21.     At that meeting, however, the consulting lab experts were not allowed access to Theranos's lab area or Edison technology.  Despite the lack of access, the consultants did find problems with Theranos's information management systems meant to keep track of patients.

22.     According to published reports, throughout the process, Walgreens executives did not press for further verification because they were afraid Theranos would respond to questions by choosing another retail chain to work with as a partner.

23.     Thereafter, later in 2011, Walgreens' outside lab consultants issued a report concluding that Walgreens needed more information to assess the proposed partnership with Theranos.

24.     Walgreens continued to work on the partnership agreement despite the lack of access to the technology.  According to published reports, Walgreens executives were comforted by reports that Safeway, Inc. had also agreed to host Theranos blood testing sites at some of its stores.  According to reports, Safeway dissolved its partnership with Theranos before it began hosting Theranos blood testing sites in Safeway stores due, in part, to the apparent unreliability of test results from Theranos tests conducted on Safeway employees at Safeway's headquarters in Pleasanton, California.[4]

25.     In response to requests for concessions from Theranos, the final agreement reached between Walgreens and Theranos, gave more control over the Wellness Centers to

---

[4] http://www.wsj.com/articles/safeway-theranos-split-after-350-million-deal-fizzles-1447205796 (last visited August 15, 2016).

CLASS ACTION COMPLAINT

Theranos: Theranos is allowed to run its Wellness Centers as an independent operation and Walgreens does not have the right to review Theranos' clinical data or financial records.

26.     Theranos relied on the joint venture agreement with Walgreens, under which Theranos has opened 40 Wellness Centers within Walgreens pharmacy stores in Arizona, and one in a pharmacy in California, to sell most of its tests.

**C.     Defendants Marketed the Technology as Accurate, Timely, and Simple, Requiring Just "a Few Drops" of Blood.**

27.     Despite the lack of hard data about the technology, when the Walgreens partnership was announced, Defendants' press release stated that the deal would offer consumers access to "less invasive and more affordable clinician-directed lab-testing, from blood samples as small as a few drops, or 1/1000 the size of a typical blood draw."

28.     Sales materials to Walgreens customers highlighted the proprietary technology and described its offerings as a "tiny blood test," and a "new way" of testing.  The materials repeatedly referenced smaller sample size and depicted the nanotainer.  Additionally, the materials assured that Theranos was "industry leading in quality and its tests were highly accurate and developed and validated under and to Federal guidelines."  Thousands of people, including Plaintiffs, believed Defendants' representations, and paid for blood testing at Walgreens Wellness Centers.

29.     Theranos described its technology as follows:



CLASS ACTION COMPLAINT

1

2        30.     Walgreens and Theranos jointly marketed Theranos's services to Walgreens'

3   customers.  Theranos focused its advertising message on the idea that its lab services were based

4   on proprietary technology, and a different model, which required far smaller samples and far less

5   blood than typical blood testing:



16

17        31.     According to reports, prior to October 2015, promotional materials promised that

18   "usually only three tiny micro vials" of blood would be collected "instead of the six or more

19   large ones," because "many" of Theranos's tests required no more than "a few drops of blood."

20   Theranos reportedly deleted the highlighted portions of the materials below in mid-2015 to

21   improve its "marketing accuracy," when news of the problems with Theranos testing became

22   public:[5]

23

24

25

26

27

28

_____

[5] http://www.wsj.com/articles/hot-startup-theranos-dials-back-lab-tests-at-fdas-behest-1444961864 (last visited August 15, 2016).

32.     On another webpage advertisement to Walgreens customers, the Company stated




that smaller samples directly benefited patients by dramatically reducing the time it takes to

analyze samples because its technology enabled a "more timely diagnosis to support better, more

informed treatment." [6]

33.     At Walgreens, Theranos offered a variety of testing directly to consumers:

[6] http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited May 22, 2016);
https://web.archive.org/web/20160407050109/http://www.walgreens.com/pharmacy/lab-testing/home.jsp (last visited August 15, 2016).

- 8 -                                                      CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





CLASS ACTION COMPLAINT

34. Theranos also advertised that its labs were accurate and "validated," or compliant with federal regulations or law.  Specifically:



**D.    Defendants' Statements About Theranos Wellness Center Testing Were False**

35. When the Theranos and Walgreens Wellness Centers opened, the Edison machines were not yet beyond the prototype stage.

36. Theranos did not have the necessary FDA approval, known as a CLIA waiver, to use the Edison Device for conducting on-site blood testing at the Wellness Centers, with the sole exception of a single test (Herpes Simplex HSV-1), for which the company obtained approval in July 2015.

37. Despite Defendants' representations to the public about the centrality of the nanotainer and Theranos's proprietary technology, by the end of 2014, Theranos was using its proprietary Edison machines and nanotainers for only 15 out of 205 tests.

38. In a report detailing objectionable conditions at Theranos dated September 16, 2015, the FDA informed Theranos that, among other things, the agency considered the

CLASS ACTION COMPLAINT

nanotainer devices to be uncleared medical devices being shipped in interstate commerce between California, Arizona, and Pennsylvania.[7]

39.     Because Theranos did not have FDA approval to conduct tests on the Edison device outside of a laboratory setting (with the limited exception for HSV-1 noted above), when Theranos drew blood at the Walgreens Wellness Centers, the samples obtained then had to be couriered to one of two centralized labs, either in Newark, California, or Scottsdale, Arizona. The proprietary Edison devices were only located in the Newark laboratory.  Accordingly, all the finger stick blood samples were analyzed at that facility, with the potential exception of samples that Theranos diluted in order to run them on conventional machinery.[8]

40.     The Scottsdale Lab only performed analyses on venipuncture tests, and only analyzed those samples on machines purchased from outside companies such as Siemens.

41.     In the context of a regulated laboratory, Theranos did not need FDA approval to perform testing using the Edison devices, so long as the Company complied with proficiency testing and other safeguards; however, the blood labs failed to comply with such testing and guidelines according to published reports.

42.     Indeed, Defendants' representations regarding Theranos's compliance with federal law were false.  In January 2016, the Centers for Medicare and Medicaid Services (CMS) cited the Newark lab for multiple serious deficiencies.  Among other things, in October 2014, 29 percent of quality control checks performed on the Company's Edison devices produced results outside the acceptable range.  A letter dated January 25, 2016 from CMS noted that, based on a December 23, 2015, survey, Theranos was found to be out of compliance with five CLIA Condition-level requirements, at least one of which posed "immediate jeopardy to patient health and safety," meaning the condition had "already caused, is causing, or is likely to cause, at any

---

[7] http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited August 15, 2016).
[8] *See* http://www.wsj.com/articles/theranos-has-struggled-with-blood-tests-1444881901 (last visited August 15, 2016).

1

2   time, serious injury or harm, or death, to individuals served by the laboratory or to the health and

3   safety of the general public."[9]

4        43.    Inspection reports found that Edison machines in the lab often failed to meet the

5   Company's own accuracy requirements, including a test to detect prostate cancer.  In one report,

6   inspectors found that 81 of 81 final patient results of a blood clotting test reported to patients on

7   the blood thinner Warfarin were not accurate.[10]

8        44.    In February 2015, an Edison device used for testing certain hormone levels failed

9   87 percent of quality control checks.

10       45.    In addition, the FDA observed that there were no quality audits being performed

11  at the Newark lab, in contravention of FDA regulations.[11]

12       46.    At the very time that Theranos was advertising compliance with federal

13  regulations, it had been repeatedly sanctioned by federal authorities.  For example, on March 18,

14  2016, Theranos received another letter from the Centers for Medicare and Medicaid Services

15  (CMS) referenced "RE: PROPOSED SANCTIONS - CONDITIONS NOT MET IMMEDIATE

16  JEOPARDY", which stated that the Company was not in compliance with accepted clinical

17  laboratory standards, and still had not established compliance with the CLIA requirements

18  previously identified.  That letter stated, "This letter provides notice of sanctions the Centers for

19  Medicare & Medicaid Services (CMS) is proposing to impose against the laboratory's Clinical

20  Laboratory Improvement Amendments of 1988 (CLIA) certificate and of the laboratory's

21  opportunity to submit in writing any evidence or information as to why the proposed sanctions

22  should not be imposed."[12]

23       47.    Theranos's conventional laboratory operations in both Scottsdale and Newark

24  were found to be flawed by government regulators.

25  [9] https://cdn2.vox-cdn.com/uploads/chorus_asset/file/5969923/Theranos_Inc_Cover_Letter_01-25-2016.0.pdf

26  [10] http://www.nytimes.com/2016/04/01/business/report-shows-theranos-testing-plagued-by-problems.html?_r=0 (last visited August 15, 2016).

27  [11] http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-afda-orgs/documents/document/ucm469395.pdf (last visited August 15, 2016).

28  [12] http://www.wsj.com/public/resources/documents/hhslettertheranos.pdf (last visited August 15, 2016).

48.     According to published reports, at Theranos's Scottsdale lab, the Company performed lab tests with certain Siemens lab equipment programmed to the wrong settings, and failed to adequately gauge the purity of the water input into Siemens lab equipment, which could affect the outcome of the results of testing run on such devices.

49.     A peer reviewed study by researchers at the Icahn School of Medicine at Mount Sinai showed that results for cholesterol tests done by Theranos differed enough from the two largest laboratory companies that it could negatively impact patient care.

50.     Regardless, Defendants continued to market Theranos blood testing services, and Theranos continued to rely on the Edison devices.

51.     On June 30, 2016, members of the House Energy and Commerce Committee requested briefing from Theranos regarding Theranos's failure to comply with federal regulatory standards governing clinical laboratory testing, and the resulting impact on patients nationwide. The Committee expressed concern over "Theranos' disregard for patient safety," and requested "information about how company policies permitted systematic violations of federal law."[13]

52.     On July 7, 2016, the Centers for Medicare and Medicaid Services issued a 33-page Notice to Theranos executives stating that it would revoke the CLIA certificate of Theranos's Newark laboratory and ban the owners and operator(s) of Theranos, including Elizabeth Holmes, from owning or running a lab for at least two years.[14]

53.     Accordingly, Defendants' statements to customers—that testing was accomplished through proprietary analysis, which was accurate and compliant with federal regulations and guidelines—were false.   Consumers did not receive what they paid for when they received blood tests from Theranos or when they purchased Theranos tests through Walgreens.

---

[13] http://democrats-energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Theranos%20Holmes%20%20Device%20Questions%20Letter%202016%2006%2030.pdf (last visited August 15, 2016).

[14] https://www.theranos.com/content/pdf/cms-findings.pdf (last visited August 15, 2016).

1

2       **E.      Factual Allegations Regarding Plaintiffs**

3              *Plaintiff B.P.*

4              54.      Beginning approximately in early 2014, Plaintiff B.P. purchased Theranos blood

5       tests several times at a Walgreens Pharmacy in the Ahwatukee District of Phoenix, Arizona.

6              55.      B.P. had received orders from his medical care provider to have blood tests

7       performed periodically.  B.P. purchased a Theranos test because he was informed by his

8       physician that it was the cheapest and least invasive alternative for the test, and he relied on the

9       representations in Theranos materials regarding the accuracy of the test results.

10             56.      The first several times that B.P. had blood drawn by Theranos, the Company used

11      nanotainer technology to draw relatively small blood samples.  Starting in or around mid-2015,

12      Theranos began collecting both nanotainer vials and one or more larger vials of blood from a

13      vein in B.P.'s arm.  By around early 2016, Theranos collected one or more larger vials of blood

14      from a vein in B.P.'s arm during each of his quarterly visits.

15             57.      After each visit, Theranos tested the blood it drew from B.P. and reported results

16      to him. Having been led to believe the results were accurate, B.P. relied on them, using the

17      results to make decisions concerning his health.

18             58.      Plaintiff B.P. would not have purchased any Theranos test if he had known that

19      the Theranos testing device did not work as described, and that Theranos did not conduct

20      accurate testing.

21      *Plaintiff D.L.*

22             59.      On or about June 1, 2015, and December 14, 2015, Plaintiff D.L. purchased

23      Theranos blood tests at a Walgreens Pharmacy in Chandler, Arizona.

24             60.      Prior to each visit, D.L. had received orders from her medical care provider to get

25      blood tests.  D.L. purchased a Theranos test because she was informed by her physician that it

26      was the quickest and cheapest alternative for the test, and she relied on the representations in

27      Theranos materials regarding the accuracy of the test results.

28

CLASS ACTION COMPLAINT

61. Despite the representations that the test could be done with a prick of the finger, each time she purchased a Theranos test, one or more vials of blood were drawn from a vein in D.L.'s arm.

62. Having been led to believe the results were accurate, D.L. relied on them, using the results to make decisions concerning her health.

63. On or about August 4, 2015, D.L. had her blood drawn and tested by ExamOne. The results of her lab work from ExamOne were dramatically different from the results that she had received in June of 2015, from Theranos.

64. Plaintiff D.L. would not have purchased any Theranos test if she had known that the Theranos testing device did not work as described, and that Theranos did not conduct accurate testing.

## V.    CLASS ACTION ALLEGATIONS

65. Plaintiffs bring this action on behalf of themselves and three proposed Classes pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

      a. **National Class:** All purchasers of Theranos lab panels and blood testing services.

      b. **Arizona Subclass:** All purchasers of Theranos lab panels and blood testing services in Arizona.

66. This action is brought as a class action and may properly be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs reserve the right to amend or modify the National Class and Arizona Subclass descriptions with greater specificity or further division into subclasses or limitation to particular issues, based on the results of discovery. Excluded from the National Class and Arizona Subclass are Defendants, their affiliates, employees, officers and directors, persons or entities, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the National Class and Arizona Subclass definitions.

67.    **Numerosity** – The members of the National Class and Arizona Subclass are so numerous that their individual joinder is impracticable.  Approximately 6.1 million tests have been performed by Theranos.  Plaintiffs believe there are at least thousands of members in each of the National Class and Arizona Subclass.  The National Class and Arizona Subclass are determinable by objective criteria using Defendants' own records.

68.    **Common Question of Fact and Law** – There are questions of law and fact common to the National Class and Arizona Subclass.  These questions predominate over any questions affecting only individual members of the Classes.  These common legal and factual issues include, but are not limited to:

      a.   Whether the laboratory tests performed by Theranos were accurate;

      b.   Whether the Edison devices performed as advertised;

      c.   Whether Theranos's testing delivered the highest degree of accuracy;

      d.   Whether Defendants' statements about Theranos laboratories were materially misleading;

      e.   Whether Defendants' conduct violates the laws as set forth in the causes of action.

69.    **Typicality** – The claims of the representative Plaintiffs are typical of the claims of each member of the National Class and Arizona Subclass.  Plaintiffs, like all other members of the National Class and Arizona Subclass, have sustained damages arising from Defendants' violations of the law, as alleged herein.  The representative Plaintiffs and the members of the National Class and Arizona Subclass were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendants.

70.    **Adequacy** – The representative Plaintiffs will fairly and adequately represent and protect the interests of the National Class and Arizona Subclass members and have retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.  There are no material conflicts between the claims of the representative Plaintiffs and

the members of the Classes that would make class certification inappropriate.  Counsel for the Classes will vigorously assert the claims of all National Class and Arizona Subclass members.

71.  **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the National Class and Arizona Subclass predominate over the questions affecting only individual members of the National Class and Arizona Subclass and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual National Class and Arizona Subclass members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for the members of the National Class and Arizona Subclass to individually redress effectively the wrongs done to them.  Even if National Class and Arizona Subclass members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

72.  Plaintiffs contemplate the eventual issuance of notice to the proposed National Class and Arizona Subclass members setting forth the subject and nature of the instant action.  Upon information and belief, Defendants' own business records and electronic media can be utilized for the contemplated notice.  To the extent that any further notice may be required, Plaintiffs would contemplate the use of additional media and/or mailings.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**(Violation of Arizona Consumer Fraud Act, A.R.S. § 44-1521, *et seq.*)**

**(Against Theranos and Walgreens; On Behalf of Arizona Subclass)**

73.     Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

74.     Plaintiffs bring this claim on behalf of themselves and on behalf of the Arizona Subclass, as defined above.

75.     Defendants are "persons" within the meaning of A.R.S. § 44-1521(6).

76.     Theranos lab panels and blood tests sold in Arizona are "merchandise" within the meaning of A.R.S. § 44-1521(5).

77.     The Arizona Consumer Fraud Act provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  A.R.S. § 44-1522(A).

78.     Based on Defendants' conduct as discussed above, Defendants have engaged in fraud and deceit as set forth in Arizona's Arizona Consumer Fraud Act.  Defendants falsely advertised the accuracy, reliability, and compliance with applicable laws of Theranos technology and laboratory testing.  Defendants also failed to disclose material facts to consumers, as alleged above.

79.     Defendants intended for Plaintiffs and Arizona Subclass members to rely on their false and misleading statements and omissions concerning Theranos and Theranos laboratory testing.  Plaintiffs and the Arizona Subclass members have reasonably relied on the material misrepresentations and omissions made by Defendants and have been damaged thereby.

80.     Defendants' conduct was wanton and reckless, and Defendants demonstrated reckless indifference to the rights, health, and safety of members of the Arizona Subclass.

CLASS ACTION COMPLAINT

81.     Plaintiffs seek relief, including punitive damages, as prayed for below.

## SECOND CAUSE OF ACTION

### (Fraud)

**(Against Theranos and Walgreens; On Behalf of Nationwide Class and Arizona Subclass)**

82.     Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

83.     Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, as defined above, and, in the alternative, the Arizona Subclass, as defined above.

84.     The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendants to Plaintiffs and the members of the Nationwide Class and Arizona Subclass, as set forth above, were known, or through reasonable care should have been known, by Defendants to be false and material and were intended by Defendants to mislead Plaintiffs and the members of the Nationwide Class and Arizona Subclass.

85.     Defendants had duties imposed by law to disclose accurate information regarding Theranos and Theranos laboratory testing.

86.     Defendants intended for Plaintiffs and Nationwide Class and Arizona Subclass members to rely on their false and misleading statements and omissions concerning Theranos and Theranos laboratory testing.

87.     Plaintiffs and the Nationwide Class and Arizona Subclass were actually misled and deceived and were induced by Defendants to purchase the testing which they would not otherwise have purchased.

88.     As a result of the conduct of Defendants, Plaintiffs and the Nationwide Class and Arizona Subclass members have been damaged in an amount to be proven at trial.

89.     Plaintiffs seek relief as prayed for below.

## THIRD CAUSE OF ACTION

### (Negligent Misrepresentation)

**(Against Theranos and Walgreens; On Behalf of Nationwide Class and Arizona Subclass)**

CLASS ACTION COMPLAINT

1

2       90.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged

3   herein.

4       91.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

5   Nationwide Class, as defined above, and, in the alternative, the Arizona Subclass, as defined

6   above.

7       92.    Defendants had a duty to provide honest and accurate information to their

8   customers so that customers could make informed decisions on the purchase laboratory testing.

9       93.    Defendants specifically and expressly misrepresented material facts to Plaintiffs

10  and the Nationwide Class and Arizona Subclass members, as discussed above.

11      94.    Defendants knew, or in the exercise of reasonable diligence should have known,

12  that the ordinary consumer would be misled by Defendants' misleading and deceptive

13  advertisements.

14      95.    Plaintiffs and the Nationwide Class and Arizona Subclass members justifiably

15  relied on Defendants' misrepresentations. As a result of the conduct of Defendants, Plaintiffs and

16  the Nationwide Class and Arizona Subclass members have been damaged in an amount to be

17  proven at trial.

18      96.    Plaintiffs seek relief as prayed for below.

19                  **FOURTH CAUSE OF ACTION**

20                      **(Unjust Enrichment)**

21  **(Against Theranos and Walgreens; On Behalf of Nationwide Class and Arizona Subclass)**

22      97.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged

23  herein.

24      98.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

25  Nationwide Class, as defined above, and, in the alternative, the Arizona Subclass, as defined

26  above.

27      99.    The misrepresentations, nondisclosure, and/or concealment of material facts made

28  by Defendants to Plaintiffs and the members of the Nationwide Class and Arizona Subclass, as

set forth above, were known, or through reasonable care should have been known, by Defendants

                        CLASS ACTION COMPLAINT

1

2    to be false and material and were intended by Defendants to mislead Plaintiffs and the members

3    of the Nationwide Class and Arizona Subclass.

4        100.    Plaintiffs and the Nationwide Class and Arizona Subclass were actually misled

5    and deceived and were induced by Defendants to purchase the testing which they would not

6    otherwise have purchased.  Defendants profited as a result of such purchases.

7        101.    It would be inequitable and unjust for Defendants to obtain these wrongfully

8    obtained profits.

9        102.    Plaintiffs seek relief as prayed for below.

10                            **FIFTH CAUSE OF ACTION**

11                              **(Aiding and Abetting)**

12    **(Against Walgreens; On Behalf of Nationwide Class and Arizona Subclass)**

13        103.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged

14    herein.

15        104.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

16    Nationwide Class, as defined above, and, in the alternative, the Arizona Subclass, as defined

17    above.

18        105.    Defendant Theranos has committed fraud causing injury to Plaintiffs and the

19    Nationwide Class and Arizona Subclass.  Defendant Walgreens' conduct alleged herein enabled,

20    substantially assisted, encouraged, and was a substantial factor in, the fraud committed as to

21    Plaintiffs and the Nationwide Class and Arizona Subclass members.

22        106.    Walgreens knew, or deliberately failed to discover, that Theranos's testing was

23    not accurate, and that Theranos labs were not compliant with federal law.  Walgreens had actual

24    knowledge of measures that it could have taken to prevent Walgreens Wellness Centers from

25    being used to perpetrate fraud, to provide consumers with accurate information, and to reduce the

26    reach of Theranos's fraudulent advertising, but nevertheless knowingly and deliberately decided

27    not to adopt such measures and instead to maintain policies that enabled and assisted the fraud.

28        107.    Before and during the commission of the fraud, Walgreens intended to aid and

abet, and did substantially assist, Theranos in fraud perpetrated on Plaintiffs and the Nationwide

Class and Arizona Subclass by deliberately treating Theranos's testing as accurate, and Theranos's labs as compliant with federal law, although Walgreens knew, or deliberately failed to discover, that neither was true, and by marketing Theranos's products and services as accurate and compliant with federal law to Walgreens customers.

108.    Walgreens' conduct alleged herein was knowing and intentional, and was carried out by Walgreens in order to benefit Walgreens, including in the form of ill-gotten profits.

109.    As a result of Walgreens' conduct alleged herein, Walgreens has unfairly received and retained substantial ill-gotten profits.

110.    Plaintiffs seek relief as prayed for below.

### SIXTH CAUSE OF ACTION

### (Violation of California Business & Professions Code Sections 17200, *et seq.*)

### (Against Theranos and Walgreens; On Behalf of Nationwide Class)

111.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

112.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, as defined above.

113.    The Unfair Business Practices Act defines unfair business competition to include any "unfair," "unlawful," or "fraudulent" business act or practice.  The Act also provides for injunctive relief, restitution, and disgorgement of profits for violations.

114.    Defendants' unlawful, unfair, and fraudulent business acts and practices are described throughout this Complaint and include, but are not limited to the following:  (1) advertising that it will provide testing using proprietary Edison devices when, in fact, Theranos did not actually use the Edison devices for most laboratory testing; and (2) conducting testing that was a not carried out within proper federal regulations.

115.    Defendants' conduct is unfair because it impairs competition within the market for blood tests.  Defendants falsely advertised and claimed Theranos blood tests are minimally invasive, accurate, and reliable.  Defendants' conduct prevents consumers from making fully

1

2   informed decisions regarding where to have their blood tests performed and by whom.

3   Reasonable consumers are likely to be deceived by Defendants' false statements.

4        116.   Defendants have violated the fraudulent prong of section 17200 because their

5   misrepresentations and material omissions are likely to deceive a reasonable consumer and the

6   facts would be material to a reasonable consumer.

7        117.   In addition to the above, the conduct as alleged throughout the complaint is

8   unlawful and constitutes a violation of False Advertising Laws, Cal. Bus. & Prof. Code § 17500,

9   *et seq.*, the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, statutory deceit, Cal.

10  Civ. Code § 1710) and fraud and negligent misrepresentation that not only result in liability as to

11  the individual causes of action, they also provide a basis for a finding of liability under

12  California Business and Professions Code § 17200, *et seq.*

13       118.   Furthermore, Defendants' practices violate the declared legislative policies as set

14  forth by the federal government in 40 C.F.R. § 600.307(a)(ii)(A); 40 C.F.R. § 600.302-08(b)(4)

15  and 16 C.F.R. § 259.2(a).

16       119.   Plaintiffs and the Nationwide Class members have been damaged by said

17  practices.  Pursuant to California Business and Professions Code §§ 17200 and 17203, Plaintiffs

18  seek relief as prayed for below.

19                    **SEVENTH CAUSE OF ACTION**

20       **(Violation of California Business & Professions Code Sections 17500, *et seq.*)**

21        **(Against Theranos and Walgreens; On Behalf of Nationwide Class)**

22       120.   Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged

23  herein.

24       121.   Plaintiffs bring this claim on behalf of themselves and on behalf of the

25  Nationwide, as defined above.

26       122.   Defendants disseminated materially misleading and deceptive information and

27  omitted material information, as discussed throughout the Complaint, for purposes of inducing

28  customers to purchase the tests, in violation of California Business and Professions Code

    § 17500, *et seq.*

123.    Plaintiffs and the Nationwide Class, and each of them, have been damaged by said practice and seek relief as prayed below.

### EIGHTH CAUSE OF ACTION

### (Violation of California Civil Code Section 1750 *et seq.*)

### (Against Theranos and Walgreens; On Behalf of Nationwide Class)

124.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

125.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, as defined above.

126.    The following definitions come within the meaning of the Consumer Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*):

      a.   The members of the Nationwide Class, all of whom purchased tests sold by Theranos for personal, family, and household purposes, are "consumers," Cal. Civ. Code § 1761(d);

      b.   Defendant Theranos is a "person," Cal. Civ. Code § 1761(c);

      c.   Defendant Walgreens is a "person," Cal. Civ. Code § 1761(c);

      d.   Plaintiffs and each and every Nationwide Class members' purchase of Theranos tests constitute "transactions," Cal. Civ. Code § 1761(e); and

      e.   The subject tests are "goods" and "services," Cal. Civ. Code § 1761 (a-b).

127.    Defendants' misrepresentations, active concealment, and failures to disclose, as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants, that are unlawful, as enumerated in section 1770(a) of the California Civil Code.

128.    Such misconduct materially affected the purchasing decisions of Plaintiffs and the members of the Nationwide Class.  Plaintiffs and the Nationwide Class members reasonably relied upon Defendants' material misrepresentations and nondisclosures, and would not have purchased Defendants' products had they known the truth.

129.    As a result of the California Civil Code section 1770 violations described above, Plaintiffs and each and every member of the Nationwide Class have suffered actual damages.

1

2      130.    Plaintiffs seek injunctive relief pursuant to California Civil Code § 1780, and as

3    prayed for below.

4      131.    Plaintiffs seek relief as prayed for below.

5 **NINTH CAUSE OF ACTION**

6 **(California Civil Code § 1710 - Deceit)**

7 **(Against Theranos and Walgreens; On Behalf of Nationwide Class)**

8      132.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged

9    herein.

10      133.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

11    Nationwide Class, as defined above.

12      134.    Based on Defendants' conduct as discussed above, Defendants have engaged in

13    fraud and deceit as set forth in California Civil Code § 1710.  Plaintiffs and the Nationwide Class

14    members have reasonably relied on the material misrepresentations and omissions made by

15    Defendants and have been damaged thereby.

16      135.    Plaintiffs seek relief as prayed for below.

17 **PRAYER FOR RELIEF**

18    WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Nationwide

19    Class and Arizona Subclass, demand judgment against and general and special relief from

20    Defendants as follows:

21      1.    An order certifying that the action may be maintained as a class action under

22    Federal Rule of Civil Procedure 23 as defined herein and appointing Plaintiffs and their counsel

23    of record to represent the defined Class(es);

24      2.    An order enjoining Defendants under Arizona Revised Statue § 44-1521, *et seq.*,

25    California Business and Professions Code §§ 17203 and 17535, and California Civil Code

26    §§ 1780 and 1781.

27          a.   To reimburse Plaintiffs and the class members the purchase price for all

28             Theranos tests as restitution of all funds improperly obtained by Defendants as

             a result of such acts and practices declared by this Court to be an unlawful,

fraudulent, or an unfair business act or practice, a violation of laws, statutes, or regulations, or constituting unfair competition;

   b.   To disgorge all profits and compensation improperly obtained by Defendants as a result of such acts and practices declared by this Court to be an unlawful, fraudulent, or an unfair business act or practice, a violation of laws, statutes, or regulations, or constituting unfair competition;

   c.   To cease engaging in false advertising and to disseminate an informational campaign to correct their misrepresentations and material omissions; and

   d.   To cease from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions.

3.   For damages under the causes of action for fraud, negligent misrepresentation, statutory Deceit, aiding and abetting, and the Arizona Consumer Fraud Act;

4.   For restitution and disgorgement of profits under the cause of action for unjust enrichment;

5.   For punitive damages, pursuant to the Arizona Consumer Fraud Act;

6.   For reasonable attorney's fees and costs, pursuant to the Arizona Consumer Fraud Act, CLRA, and other statutes as may be applicable;

7.   For prejudgment and post-judgment interest to the full extent allowed by law;

8.   For costs of suit incurred herein;

9.   For such other and further relief as the Court deems appropriate.


Dated: August 17, 2016                    KELLER ROHRBACK L.L.P.


                                   By:____/s/ Mark D. Samson_____
                                        Mark D. Samson

CLASS ACTION COMPLAINT

1

2       Mark D. Samson
        KELLER ROHRBACK L.L.P.
3       3101 North Central Ave., Suite 1400
        Phoenix, AZ 85012
4       Phone: (602) 248-0088, Fax (602) 248-2822
        msamson@kellerrohrback.com
5
        Michael W. Sobol*
6       Roger N. Heller*
        Melissa Gardner*
7       LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
        275 Battery Street, 29th Floor
8       San Francisco, CA  94111-3339
        Telephone:  (415) 956-1000
9       Facsimile:  (415) 956-1008
        msobol@lchb.com
10      rheller@lchb.com
11
        Richard D. McCune*
12      rdm@mccunewright.com
        David C. Wright*
13      dcw@mccunewright.com
        Elaine S. Kusel*
14      esk@mccunewright.com
        McCuneWright, LLP
15      2068 Orange Tree Lane, Suite 216
        Redlands, California  92374
16      Telephone:  (909) 557-1250
        Facsimile:  (909) 557-1275
17
        Joseph G. Sauder*
18      jgs@mccunewright.com.com
        Matthew D. Schelkopf*
19      mds@mccunewright.com
        Joseph B. Kenney*
20      jkb@mccunewright.com
        McCuneWright, LLP
21      1055 Westlakes Drive, Suite 300
        Berwyn, Pennsylvania 19312
22      Telephone:  610.200.0580
23      *Attorneys for Plaintiffs and the Proposed Class*
        *Pro Hac Vice* applications forthcoming
24

25

26

27

28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: August 17, 2016                KELLER ROHRBACK L.L.P.


By:   /s/ Mark D. Samson
          Mark D. Samson

Mark D. Samson
KELLER ROHRBACK L.L.P.
3101 North Central Ave., Suite 1400
Phoenix, AZ 85012
Phone: (602) 248-0088, Fax (602) 248-2822
msamson@kellerrohrback.com

*Attorneys for Plaintiffs and the Proposed Class*